Filed 1/30/14  P. v. Helsema CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# THIRD APPELLATE DISTRICT

## (Butte)

----

| | |
|---|---|
| THE PEOPLE, | C073323 |
| Plaintiff and Respondent, | (Super. Ct. Nos. CM036062, CM036509) |
| v. | |
| JOHN LAWRENCE HALSEMA, | |
| Defendant and Appellant. | |

A jury found defendant John Lawrence Halsema guilty of second degree murder, sustaining an allegation that his personal use of a gun resulted in death.  While trial in the present matter was pending, another jury convicted defendant in a case of manufacturing a controlled substance (CM036509), for which he received a three-year county prison term.  The trial court resentenced defendant to a determinate state prison term for the drug conviction, and imposed a consecutive indeterminate 40-year state prison term for

the present offense (CM036062).  As is pertinent in this appeal, the court also imposed a restitution fine of $280 and a general fine of $200 (with $580 in fees and assessments).

On appeal, defendant contends the trial court erred in failing to instruct sua sponte on a theory of voluntary manslaughter as a result of provocation.  He also contends the trial court reimposed a general fine in connection with his drug conviction, which this court held to be unauthorized in defendant's prior appeal, of which we have granted judicial notice in this appeal.  (*People v. Halsema* (July 31, 2013, C072318) [nonpub. opn.].)  We agree there is substantial evidence of provocation, which the trial court found credible in connection with an instruction on deciding the degree of murder, but the court otherwise mistakenly believed instructions on voluntary manslaughter were inapplicable.  We must therefore reverse the judgment for retrial.  For guidance in the event of resentencing, unlike the prior appeal, it is proper to impose a general fine pursuant to Penal Code section 672[1] in connection with the homicide conviction (which is what the trial court in fact did) and, on our own motion, we note that the minimum restitution and parole revocation fines applicable to the 2012 crime are $240, respectively, not $280.

### FACTUAL AND PROCEDURAL BACKGROUND

Defendant had been living in his "best friend's" residence since 2011, several months before the shooting.  It is undisputed that defendant called a dispatcher in February 2012 to report that he had fatally shot his housemate, Craig Davies (the victim), by accident nine days earlier, who was still lying where he fell.  He told the dispatcher that he had not reported the death to anyone.  There was a large knife found in the victim's hand, which the pathologist considered to be staged because it should have fallen from the victim's hand after he was shot.  The autopsy determined that the victim had bled to death within minutes from a single gunshot wound to his back, which passed

---

[1]  Undesignated statutory references are to the Penal Code.

2

through his body on a slightly downward trajectory from right to left. The victim had methamphetamine in his system. Defendant gave numerous accounts of what had happened.

The first account was to a mutual friend of the two who had stopped by the home about a week after the shooting to borrow defendant's guitar. Defendant was outside. He told the friend he had killed the victim because the victim was going to kill defendant's dog. The friend knew that defendant was devoted to his dog, but was surprised that the animal-loving victim would have attempted to harm it. Defendant gave the friend the guitar, and told the friend to return and take defendant's truck and tools as well, in order to keep them from being seized. (Defendant testified that he offered the friend any of his belongings, including his dog.) Defendant made it clear that he intentionally shot the victim, who was in a rage at the time, but had not meant to kill him. The friend had noticed that the victim recently "was getting kind of violent," and had been complaining about defendant's dog biting a neighbor (which was a source of tension between defendant and the victim).[2]

A second account was to a deputy who responded to the dispatch. The deputy spoke with defendant at the scene. Defendant told the deputy the victim had borrowed his gun to euthanize an old stray dog on the property, but had been unable to perform the act and put the gun back on the bed in defendant's room. Defendant brought the gun out of the bedroom and told the victim that it was not appropriate to leave a loaded gun on defendant's bed, intending to demonstrate how to unload it. The victim knocked a glass out of defendant's hand, and defendant went to kick the victim in the rear end. Defendant

---

[2] About six months earlier, defendant's dog had leaped over a fence into the neighbor's yard and killed a dog; it also bit the neighbor when he was visiting. Defendant paid the neighbor several hundred dollars in compensation. The victim demanded that defendant keep his dog tied up, because he was concerned about being sued if the dog bit anyone else.

3

stumbled and accidentally fired the gun when he grabbed at it after it fell out of his hand. Defendant said the encounter had not been confrontational; they had been "horsing around." Defendant had only a rambling and nonresponsive answer about the victim's eating habits when the deputy asked about the knife found in the victim's hand. Defendant did not mention his own dog having any involvement in the shooting. Defendant said that he had held off making any official report of the death in order to receive his Social Security check, which he intended to give to the victim's daughter (reiterating this explanation in a later interview). At trial, on cross-examination, defendant did not recall anything about this statement to the deputy.

A third account was when defendant was interviewed by Detective Philip Wysocki later that day. Defendant first said that he and the victim had been engaging in "horseplay"—he again mentioned the victim slapping a drink out of his hand and his trying to kick the victim in the rear end, in the process of which defendant lost his grip on the gun he was holding (which fired when he grabbed at it). He did not mention anything about his dog being involved or claim that he felt the victim posed any threat to defendant. When asked about the knife found in the victim's hand, defendant at first said he had not seen a knife until after the shooting. Defendant eventually admitted to the detective that he had put the knife in the victim's hand because he wanted to make it appear that the victim had been the aggressor and defendant had been acting in self-defense, but he decided simply to tell the truth.[3]

In an interview with Detective Wysocki two days later, defendant's account changed. He abandoned his claim of horseplay. He was holding the gun because he wanted to reproach the victim for leaving it loaded on the bed, where defendant's dog had knocked it on the floor. During what defendant called a temper tantrum (in which the

---

[3] At trial, defendant conceded that he had not shot the victim in self-defense.

4

victim was briefly turning in circles while holding a knife after knocking the drink out of defendant's hand), the victim was insisting that defendant kill the stray dog that had come onto the property, or else the victim would kill defendant's dog. Defendant did not specifically assert he was acting in defense of his dog, because he repeatedly stated that he did not think the victim was capable of intentionally harming the animal (as the victim could not even bring himself to shoot the injured stray). However, defendant said he was concerned because he could not see whether the dog was in the victim's proximity during the tantrum with the knife, and he could not let the victim hurt his dog (which meant more to him than anything). When challenged on the point, defendant continued to insist on the accidental nature of the shooting; he claimed the gun fired as he was stepping backward, and he could not recall pulling the trigger.[4] Defendant specifically abjured being in a "blind rage" at the time of the shooting, stating "I don't get in a blind rage." He again admitted that he had put the knife back in the victim's hand in order to concoct a scenario of self-defense. He also said that the victim had been "acting crazier" lately, to which their mutual friend could attest.

At trial, defendant testified that he found his gun on the floor of his bedroom. The victim had said he had placed it on the bed, so defendant assumed his dog had knocked it onto the floor. This upset defendant because the gun was loaded and cocked with the safety off. Defendant confronted the victim about leaving the gun in that condition on the bed. In the course of the argument, the victim became quite agitated and knocked a drink out of defendant's hand (something the two of them did frequently, so defendant did not take it seriously). The victim went into the kitchen and returned with a knife. Defendant's dog was keeping the victim away from defendant. The victim verbally threatened to kill defendant and his dog, which defendant also did not take seriously.

---

[4] When tested, the gun required a significant amount of pressure to pull the trigger; the gun expert would not characterize it at all as a "hair trigger."

While the victim was circling defendant and the dog, the gun "went off" (in the classic passive voice employed in such cases) when defendant raised his arm. Defendant had not meant either to fire the gun or to kill the victim; defendant believed it happened because he was in a panic that the victim might hurt his dog while flailing around with the knife; at the time, he had forgotten that he was even holding the gun. He described pulling the trigger as "an involuntary reaction . . . , yes, I pulled the trigger. I killed Craig. It was an accident." He likened it to braking without thinking when someone runs in front of a car. He looked at the victim and realized assistance was futile because the victim was already dead. Defendant could not move the victim from where he lay because he was a heavy man.

## DISCUSSION

### I. Instruction on Voluntary Manslaughter

The trial court agreed to instruct that the presence of provocation could prevent the deliberation necessary for first degree murder. However, in discussing lesser offenses, the trial court quoted from a manual on instructions, which cited *People v. Saille* (1991) 54 Cal.3d 1103, 1116 (*Saille*), for the proposition that in the absence of "an intent unlawfully to kill," the only lesser alternatives to murder are involuntary manslaughter or acquittal.[5] The court reiterated the point on the following day, asserting that the defense theory of an accidental shooting meant there was a lack of an intent to kill and therefore voluntary manslaughter was not a lesser option. Defense counsel concurred in the court's reasoning, and stated defendant would not be requesting an instruction on voluntary manslaughter. The trial court erred in two respects.

---

[5] The Supreme Court made this statement in concluding that evidence of voluntary intoxication negating *express malice* (described as "an intent unlawfully to kill") did not entitle a defendant to an instruction on voluntary manslaughter. (*Saille*, *supra*, 54 Cal.3d at pp. 1116-1117.)

First, if the *evidence* supports a finding of a lesser offense, a trial court must instruct on it regardless of whether it is inconsistent with the theory of the defense, and even over the objection of defendant. "[T]he sua sponte duty to instruct on lesser included offenses . . . arises even against the defendant's wishes, and regardless of the trial theories or tactics the defendant has actually pursued." (*People v. Breverman* (1998) 19 Cal.4th 142, 162 (*Breverman*).) Thus, where—as in *Breverman*—substantial evidence of heat of passion exists, a court has a duty to instruct on the lesser offense of voluntary manslaughter even where a defendant claims a killing was accidental. (*Id*. at p. 163, fn. 10, citing *People v. Barton* (1995) 12 Cal.4th 186, 202 [killing claimed to be accidental occurred during heated argument; court must instruct on heat of passion and voluntary manslaughter].)

Second, the Supreme Court has clarified in the years since *Saille* that " 'an unlawful killing without malice (because of a sudden quarrel or heat of passion) is voluntary manslaughter, regardless of whether there was an intent to kill,' " as long as implied malice—"a conscious disregard for life," in the short-hand formulation—is present. (*People v. Bryant* (2013) 56 Cal.4th 959, 967, 968, 969-970, reaffirming *People v. Lasko* (2000) 23 Cal.4th 101 and *People v. Blakeley* (2000) 23 Cal.4th 82.)

The trial court instructed the jury on a theory of implied malice as a basis for murder. Although focusing his argument on premeditated murder, the prosecutor mentioned this as an alternate theory for finding defendant guilty of murder, pointing out that defendant had his hand on the trigger with the hammer back and the safety off. Thus, after rejecting defendant's claim of accident, the jury could have had an analytic basis for finding second degree murder if it found implied malice was present, even if defendant did not *intend* to kill the victim. On the other hand, the jury could also have found that actual malice was present and defendant did not in fact deliberate or was

7

sufficiently provoked to preclude finding deliberation. In either event, voluntary manslaughter would have been a proper lesser offense.

The question thus is whether the facts we have summarized above are substantial evidence that defendant's reason *was* clouded as the result of a strong passion, the cause of which was a type of provocation sufficient to arouse an intense emotion (other than revenge) in a reasonable person that overcame the ability to act on the basis of reason. (*People v. Steele* (2002) 27 Cal.4th 1230, 1252-1253; *People v. Lee* (1999) 20 Cal.4th 47, 59-60; *Breverman*, *supra*, 19 Cal.4th at p. 163; *People v. Valentine* (1946) 28 Cal.2d 121, 139.)[6] In evaluating the objective component, the focus is whether the provocation (be it a sudden quarrel or otherwise) was sufficient to induce the *intense emotion*, not whether it was sufficient to provoke a reasonable person *to kill*. (*People v. Beltran* (2013) 56 Cal.4th 935, 938-939 (*Beltran*).)

It would not appear there is sufficient evidence of provocation through sudden quarrel. Defendant expressly asserted that he was not acting in a blind rage as a result of the fight with the victim, nor felt any apprehension for his own safety, at least at the time of the shooting.

However, defendant attested to a state of extreme concern for the safety of his beloved dog—which was in close proximity to what defendant claimed was an enraged victim wildly swinging a knife—that distracted him from any other consideration. While he did not consistently impart this basis for his actions to the deputy and detective, it is

---

**6** The People do not suggest defendant has forfeited this issue because defense counsel acceded to the trial court's mistaken interpretation of the law. Invited error applies only where the record allows us to impute to defense counsel an exercise of *reasoned* tactics rather than ignorance or mistake in taking a deliberate action. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 49; *People v. Boyette* (2002) 29 Cal.4th 381, 438; *People v. Bunyard* (1988) 45 Cal.3d 1189, 1234; *People v. Wickersham* (1982) 32 Cal.3d 307, 333-334.)

the explanation that dates back to the first person he encountered after the shooting. The People point to the inconsistencies in defendant's explanations, and his assertion of a theory of accident, but that is for a jury to resolve; it does not detract from the substantial nature of the evidence in support of provocation based on this testimony *if credited* (as in *Breverman* and *Barton*). The People do not otherwise assert that a threat of deadly force to a pet is not a reasonable basis for experiencing an intense emotion that clouds reason. (See *People v. Bacon* (2010) 50 Cal.4th 1082, 1126 [describing defense counsel's effort to mitigate prior murder at penalty phase as being provoked by kicking of pet dog as a "manslaughter-type" theory].)

We note that the trial court found the presence of at least sufficient provocation on this basis to instruct that it could preclude the presence of deliberation if the jury credited it. It is thus likely that, had the court not been mistaken about yielding to the defense theory of accident or the need for an intent to kill to establish voluntary manslaughter, the court would have instructed that provocation could also mitigate what would otherwise be murder to voluntary manslaughter.

We cannot agree with the People that it is not reasonably probable defendant would have obtained a more favorable verdict if the jury had been instructed on the lesser offense. (*Beltran*, *supra*, 56 Cal.4th at p. 955 [rejecting claim that federal due process rights violated by ambiguous instruction on provocation]; contra, *People v. Thomas* (2013) 218 Cal.App.4th 630, 633, 643 [on remand from the California Supreme Court with directions to consider the issue, First Appellate District, Division Three, concludes federal due process requires proof of malice beyond reasonable doubt and therefore failure to instruct on provocation must be found harmless beyond a reasonable doubt].)[7]

---

[7] Because the failure to instruct does not pass muster even under the more lenient standard for prejudice, we do not need to explore the extent of any inconsistency between

9

The People emphasize that defense counsel preferred to seek exculpation through accident, which they assert was "the only viable defense" because the victim was shot in the back and defendant did not consistently assert provocation. The location of the wound is not determinative, because defendant asserted the victim was in agitated motion and thus simply may have turned abruptly just as defendant fired. As for the strategy of defense counsel, this is not a basis for assessing what a *jury* might decide on the conflicting evidence if instructed on provocation and the lesser offense of voluntary manslaughter. The mutual friend corroborated defendant's claim that the victim was becoming subject to fits of angry violence. Even with what the prosecution felt was a strong case for premeditated murder once a defense of accident was rejected, the jury nonetheless convicted defendant only of second degree murder. This raises the strong prospect that the jury may have credited the claim of provocation and relied on it as a basis for finding murder in the second degree rather than first (as opposed to taking the route of implied malice). This is all that is necessary to make the failure to instruct prejudicial and entitle defendant to the opportunity to convince a jury that voluntary manslaughter is appropriate; we do not need certainty that this will be the outcome. We will therefore reverse the judgment for retrial.

## II. The General Fine Is Authorized on Reconviction

As noted above, we struck the general fine imposed in defendant's other case because a fine was already authorized for his manufacturing offense. "The operative language of section 672 is the second phrase of the first sentence, 'in relation to which no fine is herein prescribed.' " (*People v. Breazell* (2002) 104 Cal.App.4th 298, 302.) "The language used in section 672 demonstrates that it was meant to provide a fine for offenses *for which another statute did not impose a fine*." (*Id.*, at p. 304, italics added.)

the June 2013 decision in *Beltran* and the August 2013 decision in *Thomas* (in which the Supreme Court denied review on Oct. 30, 2013, S213262).

10

As we noted above, the trial court imposed a general fine pursuant to section 672 of $200 (with $580 in fees and assessments) at sentencing. Defendant interprets this fine as impermissibly applying to his *other* offense (CM036509), and contends it is therefore unauthorized. This misreads the record. The trial court, other than modifying defendant's sentence in the other case to a state prison placement, did not revisit any of the fines, fees, or penalty assessments it had previously imposed in that matter, nor do any of these (or the general fine) appear in the determinate abstract for the sentence in the other case. The only reference to the other case in the indeterminate abstract of the sentence in the present case is a direction that sentence was to be served consecutive to the determinate term in the other case (as is required by law). None of the offenses in the present case provide for fines, and therefore the general fine pursuant to section 672 is authorized. We therefore reject defendant's claim of error, and the trial court may properly reimpose it in the present case if defendant is reconvicted.

### III. The Restitution Fine Must Be Reduced on Reconviction

Our review of the record has revealed an issue we reach on our own motion for guidance of the trial court on remand. As this is a relatively uncontroverted matter reflecting error as a matter of law, we do not see any purpose in soliciting supplemental briefing regarding our disposition of it. Should the People purport to be aggrieved as a result, they may petition for rehearing. (Gov. Code, § 68081.)

At sentencing, the trial court stated, "it's my hope that restitution [to the victim's family members] can be paid prior to anything else. So in that event, I will reduce the restitution fine." When the court asked its probation officer for the amount of the statutory minimum, he responded, "$280" and the court imposed $280 restitution and parole revocation fines.

11

The $280 minimum was the amount in effect at the time of sentencing in 2013. However, the minimum in effect at the time of defendant's offense in 2012 was $240. (§ 1202.4, subd. (b)(1).)

Because this statute is considered punishment for purposes of ex post facto analysis (*People v. Valenzuela* (2009) 172 Cal.App.4th 1246, 1248), the minimum fine in effect at the time of defendant's offenses was controlling (see *John L. v. Superior Court* (2004) 33 Cal.4th 158, 182, citing *Lindsey v. Washington* (1937) 301 U.S. 397, 400 [81 L.Ed. 1182] [cannot increase minimum punishment after commission of offense]). Therefore, in the event defendant is reconvicted, the trial court should limit the restitution and parole revocation fines to $240.

## DISPOSITION

The judgment is reversed and the matter remanded to the trial court for retrial.

                              _____BUTZ_____, J.

We concur:

_____ROBIE_____, Acting P. J.

_____MAURO_____, J.